Good morning, your honors. I represent Anna Avanesova, who is president in court today. She's ethnically partially Armenian and that was living in Georgia, and that's where her problems arose. BIA found her credible, and therefore the issue turns on whether there was past persecution, and I believe that's just two main incidents while the petitioner did testify to constant harassment and abuse of our ethnic Armenians in Georgia. She did have a couple incidents. One was a police brutality incident where they came into her mother's apartment, pushed them on the ground, police kicked them with their police boots and used ethnic slurs. The BIA found this not to rise to the level of past persecution, but I would disagree. I think that police brutality, unchecked, regardless of the fact that petitioner did not go to the hospital, would amount to past persecution. I believe the case law backs that up. Combine that with the incident at the school where a petitioner was put through a mock trial and then raped as a punitive measure because of her ethnicity. Even though that was not done by the authorities, it is because of her ethnicity. And again, the BIA focused on the fact that she did not report this incident to the police. However, she did report it to the school authorities who directed her not to report it to the police to protect the school's reputation, not for any other purpose. And Ms. Avinasova, having been mistreated by the police in the past, did not run to the police. Also, when she went to seek medical attention after the incident, she was not treated properly there as well. So you could see why she would not report it. I don't believe, as stated in my reply brief, I don't believe there is a requirement that the incident be reported to the police. Only that there be a showing that the Georgian government is unwilling or unable to go after the perpetrators of this. And if you look at 2002 and 2003 State Department reports, page 40 of my opening brief, you'll see that it states specifically that the Georgian government does not adequately, adequately go after rape investigations. Therefore, I think there is a past persecution. There is also a What relief are you asking for here? We're asking for asylum as well as withholding of removal. But what do you want us to do with the case? Your Honor, I believe we should remand it for exercise of discretion on whether or not she's eligible for asylum. Right. Did the board or the I.J. address changed country conditions? No, Your Honor, because I know the judge did not address it because he found her story lacking succinctness. But do you think we should remand for the board or the I.J. to consider changed country conditions? I think that as well, Your Honor, yes. So then what relief are you asking for? We're asking for both. Well, if we were to grant it outright and just remand it back for the exercise of discretion, whether or not she's eligible for asylum, I think we should remand for the board or the I.J. to consider changed country conditions. I guess when I said both, I should have said any alternative. If you are going to remand for the asylum grant, then yes, I would not think it necessary to look at well-founded fear of future persecution. My question was what are you asking? What am I asking for? For the asylum, Your Honor, on the discretion issue. In the record, is there any report on country conditions in the current record? Well, there's the country reports, the State Department reports, O2 and O3. There's O2 and O3. Right. There's a whole litany of other things. As a fallback argument in the alternative would be also there was no analysis as to this favored group of Armenians in Georgia. But I don't even think that's necessary in this case because I think there's a viable asylum claim. Did you make a claim for humanitarian relief? I think we argued it in the BIA brief. You didn't argue it to us, however. I think it is mentioned somewhere in the opening brief that usually rape cases are given the humanitarian consideration and you don't necessarily need a showing of rebutting the well-founded fear of future persecution. I think that is mentioned. I'd have to look for it, Your Honor. On the brutality claim, am I wrong on the police were summoned by neighbors because of screaming? That is correct, Your Honor. And that no arrests were made as a result. That is correct. That is correct. It's our argument that once the police entered the apartment, they really didn't seem to investigate the noise complaint. They seemed more concerned with petitioner and her family's That is correct. And rather than take it to the police, she took it to the faculty center or whatever. And the college then said, look, we'll make a trade with you. We'll pass you and you don't say anything because we don't want to bring discredit. And that's the two incidents upon which you hang your head. Those are the two main incidents, Your Honor, as long as the overall atmosphere of harassment. Is there anything in the record that tells us was this a public school or government-run school or was it a private school or do we know? I think it was a state institution, Your Honor. Is there anything in the record that says it was a state institution? I have to look for it. Yeah, I'm not sure, but the point of the matter is, is that when a government is unwilling or unable to control their people, whether it's student, faculty or common citizens, there's a viable question. Was a complaint made to the government? I'm sorry? Was a complaint made to the government? It was made to the school. But that wasn't my question. Was a complaint made to the government? No. No. But like I argued, I don't know if that's a requirement. I don't see that being a requirement. Well, if you're accusing the government of not being fair to her ethnic group, it does seem like they ought to get a chance, doesn't it? It does, Your Honor. I do see your point. However, when you put that together with the fact she was mistreated by the police once before, the school specifically told her not to report it to the police. The country reports say that the What effect does the discrimination against the mother have on this case, if anything? It does show that how Georgians are, I mean, Armenians are treated in Georgia. However, the mom's case arose from corruption from her work at a state institution. Therefore, the government of based on the ethnicity. So therefore, even though they're willing to help with the mother's case, it's not exactly on point. What happened when the case went to trial? What happened when the case went to trial was the prosecutors focused on the mom's ethnicity, and she was not treated fairly by the Georgian government. Can I reserve my remaining minutes? Yes. We'll hear from the Good morning. John Williams on behalf of the government. Your Honor, while it's unfortunate that the petitioner suffered from a serious criminal act while she was attending college at Georgia, the petitioner failed to demonstrate that the Georgian government was unable or unwilling to the Georgian government. But she had been abused by the police before. Well, you can't deny that. Yes, the government would not would not would not concede that. There were some children throwing rocks at the window of her mother's apartment, and neighbors called to request that the authorities come indeed to to investigate that. And when they got there, they just entered the apartment and and and and there she was. She was kicked. They trashed the apartment and abused the occupants? There was there was no evidence that this was on account of her being Armenian. They investigated within 15 minutes. They found that there was no crime and they left. So the main evidence in the record of what they did while they were there. Well, the evidence is is that they did not state that that they were they were doing anything because she was Armenian. They were called there by neighbors. They weren't called there. I understand that, but the petitioner testified, she testified that that it was her neighbors who called the authorities there. That's right, but what did the police say while they were there and what did they do? That's the critical part. Well, and what the facts state is that they were there for 15 minutes. They investigated the they they looked around the apartment and outside of the apartment. And what the petitioner claims is that when they burst into the apartment, she was kicked. That's that's what's in that's what's in the record of this. And they left 15 minutes. They left and they never came back to that to her apartment or had any other contact with the petitioner. What terms the police used? There's no there's no evidence that they used any terms. And for sure, there's there were no statements made that that they called her by any names or said anything about her ethnicity. The main the main crime that that that counsel's base in this is his case on the petitioner's claim is that she suffered ill will as a victim at the at the college. And now here's an instance where she chose not to report. And what makes it so bad is that she negotiated with the university to obtain a degree and ask the university to provide her with with good grades and a degree. So when you say she negotiated, is there any evidence that she was the one that suggested this? Well, there there is not necessarily evidence that she suggested it, but she indicated that she had the choice to report this to to the police and she chose not to. She leveraged she leveraged her being a victim to try and obtain a college degree. And the record does not support that. Well, the record supports is that the school was very concerned for its reputation and they offered her these things if she didn't report. Now, is that a more accurate reflection of what the record shows? Well, that's that's what the record shows. And, Your Honor, I would I would dare say the inference drawn from there is that the university believed that the Georgian authorities would indeed investigate and try and protect her and so forth. And she chose not to avail that. I mean, she can't have it both ways, Your Honor. She can't choose not to allow the Georgian authorities not to not to investigate and then come come to the country and say, you know, guess what? I was persecuted on account and the Georgian authorities are not going to protect me or unwilling or able to protect me. And she didn't do that. She chose not to. She says that. And and I believe that's where and that's why the immigration judge and the board found that she didn't establish past persecution. What does the country report show? Well, the country report indicates that that indeed it makes no mention of ethnic harassment or violence against Armenians, that the government respects the rights of Armenians, specifically in the location of Tbilisi, where this petitioner was living in Tbilisi, Georgia. And that's where we stand with it, with the country report. Now, she wasn't just Armenian. She was also the unpronounceable other ethnic. Sure. And it states with regard to that as well, the same similar statements that I mentioned. Exactly what does it state? I don't have the quote right in front of me, but basically that that they allow the rights of Armenians and respect those those rights and the areas where there is nonviolence going on. Obviously, you know, there's there's sometimes some unrest when these incidents occurred. But in this particular location in Tbilisi, Georgia, that wasn't the case. So what you have is no nexus as far as the the incident where the Georgian police came to her apartment. And you have an incident at the college where she didn't report. The withholding claim, as the government will stand on its argument in its brief, that that claim was waived in the petitioner's opening brief. The on appeal to the board, the petitioner argued that for the first time, a pattern of practice of persecution, trying to relieve herself of any individualized type of claim, having to make that burden. So there was no disfavored persecution claim made. And there was no humanitarian. Did she waive that claim? Yes. Well, she did argue pattern of practice. Why doesn't that subsume the other argument? That disfavored group analysis. Well, because because two things. She's got to she's got to advance the argument that she was individually. She pointed to, you know, she pointed to instances. Yes. She argued pattern of practice. And but she has to. The law requires that she advance that she was individually persecuted. And she's got to show that compelling that compelling reasons that Armenians are disfavored group. Did the IG didn't have the benefit of our recent cases in I think it was Wackery? No. I mean, this this this this case preceded Wackery. Correct. In any event, let me ask you if we should. I don't know how this case is going to come out. But if we should disagree with you on the past persecution issue, what do we do with the case from here? From the government's perspective? Well, the thing is, is to obtain the you ask about whether or not the country had maybe rebutted with any country could change country conditions. And since they didn't establish the past persecution, they didn't get a rebuttable presumption. The petition didn't get a rebuttable presumption. This is just a hypothetical to you that there is past persecution. So Judge Pius is asking you to answer that with the outcome. Well, I would I would contend that the country report is present. And the board did look to the country report for the fact that Armenians, especially in Tbilisi, that there was no evidence that they're they're being persecuted or that the government's unwilling or unable to protect them. I would note that that it was admiral of. So is it your is it the government's position that she could even if you were to assume past persecution, the evidence in the record is sufficient to show that she could relocate any place in the country? Well, I don't know that that point was made by the board, that they looked at internal relocation. But in Tbilisi, where she was actually living, it was actually a place where they had honored that Georgia authorities were protecting. And I would note that that they filed a that the council had really point. He filed a motion to reopen a subsequent this and advised the court. And during that motion, the rope reopened, which is subsequent to this, not in the record, but pointed out evidence. And that motion reopen was denied by the board. So that's why the court still has jurisdiction of this. I would just wrap up and say that the petitioner has not presented a compelling evidence to this court to overturn the board's decision. And I would ask the court that it denied the petition. Thank you. First of all, I'd just like to state that the police did use ethnic slurs in that incident of what I call police brutality. The 15 minutes that Respondents Council has stated when a respondent was kicked. Obviously, they don't kick her saying this is because you're Armenian. But when an Armenian slur is used, I think it does indicate that that's this is a pre real idea case. Mixed motive is acceptable. Your Honors. Also, to state that petitioner was negotiating a settlement with the school is completely inaccurate. She didn't walk in with attorneys and negotiate anything. She's the one at a disadvantage as far as the negotiation leverage is concerned. I think that's clear. She is a rape victim. We should not blame the victim. Lastly, there's other evidence in the record. In addition to the State Department reports, if you look at the opening brief I submitted, page 48 and 49, it shows that there's newspaper articles showing desecrations of Armenian churches and cemeteries. An Armenian church in Georgia demonstrating a solicitation letter that they have problems. It's in the record that this is not just from the country reports, nor the motion to reopen Council mentioned. And on that, we submit to the Court that this is not a case for asylum. Thank you. Thank you. Thank you for your argument, counsel. The matter is submitted.
judges: Walter, Fletcher B. , Paez